**FaUNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
LAROSS PARTNERS, LLC,

                                  Plaintiff,

                                              **DECISION AND ORDER**
            -against-                            11-cv-1980 (ADS)(ARL)

CONTACT 911 INC. and FAMILYCONTACT911.COM,
LLC,

                                  Defendants,
-------------------------------------------------------------------X

**APPEARANCES:**

**Magnozzi & Kye, LLP**
*Attorneys for the Plaintiff*
1 Expressway Plaza
Suite 114
Roslyn Heights, NY 11577
      By: Mark F. Magnozzi, Esq.
         Matthew F. Kye, Esq.
         Cynthia S. Butera, Esq., Of Counsel

**Moran Karamouzis LLP**
*Attorneys for the Defendants*
265 Sunrise Highway
Suite 61
Rockville Centre, NY 11570
      By:  Andrew P. Karamouzis, Esq., Of Counsel

**SPATT, District Judge.**

      Jury selection in this case is scheduled for June 22, 2015.

      By way of background, on March 2, 2011, the Plaintiff LaRoss Partners, LLC (the

"Plaintiff" or "LaRoss") commenced this action in Supreme Court, Nassau County against

Contact 911 Inc. ("Contact") and FamilyContact911.com LLC ("Family")(collectively the

"Defendants").  This action was based on claims of breach of contract, unjust enrichment, fraud,

and conversion.

On April 21, 2011, the case was removed to this Court.

On October 6, 2011, Family moved to dismiss the amended complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(2). In the alternative, Family moved to dismiss the Plaintiff's second (unjust enrichment), third (fraud), fourth (conversion), fifth (accounting) and sixth (attorneys' fees) causes of action for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Contact joined in moving to dismiss LaRoss's third, fourth, fifth, and sixth causes of action for failure to state a claim.

On July 10, 2012, the Court granted in part and denied in part the Defendants' motion to dismiss. In particular, the Court granted the motion as to LaRoss's fraud, conversion, unjust enrichment, and accounting claims and dismissed those claims with prejudice. The Court denied that part of the motion to dismiss for lack of personal jurisdiction and to dismiss the claim for attorneys' fees.

The remaining claims are the parties' respective claims for breach of contract. Both parties also seek attorneys' fees under the indemnification provision, Section 3(c), of the underlying contract.

On March 18, 2015, after receiving a waiver of this Court's Individual Rule regarding requests for pre-motion conferences, the Defendants moved (1) pursuant to Fed. R. Civ. P. 56(b) for summary judgment dismissing LaRoss's outstanding claims; (2) pursuant to Fed. R. Civ. P. 56(a) for summary judgment in their favor on their breach of contract counterclaim and their claim for attorneys' fees; and (3) for attorneys' fees, costs, and disbursements in defending this action.

On April 27, 2015, LaRoss opposed the Defendants' motion for summary judgment and,

without requesting a waiver of this Court's Individual Rule regarding pre-motion conferences, cross-moved (1) pursuant to Fed. R. Civ. P. 56(b) for summary judgment in its favor and dismissing the Defendants' counterclaims; (2) pursuant to Fed. R. Civ. P. 56(a) for summary judgment in its favor on its breach of contract and attorneys' fees claims; and (3) for attorneys' fees, costs, and disbursements in bringing this action.

Given the upcoming date for jury selection and the fact that the Court waived the pre-motion requirement for the Defendants, the Court excuses the Plaintiff's failure to move for a pre-motion conference or a waiver of such a conference before filing its cross-motion for summary judgment.

For the reasons set forth below, the Defendants' motion for summary judgment is granted in part and denied in part and LaRoss's cross-motion for summary judgment is denied.

## I. BACKGROUND

Unless stated otherwise, the following facts are drawn from the parties' Rule 56.1 statements and attached exhibits. Triable issues of fact are noted.

The Plaintiff is a New York limited liability corporation that provides various services, including billing, marketing, and customer service for companies like the Defendants, which provide emergency contact services. The purpose of an emergency contact service is that during a catastrophic event, such as a terrorist attack or natural disaster, an individual can conveniently pass along a message in an automated fashion to those in one's "Contact List." This service is charged to customers on their phone bill.

Jeffrey Lavino ("Lavino") and Thomas Rossi ("Rossi") were at all relevant times principals and equity owners of LaRoss. Lavino and Rossi, who are cousins with each other, are equal partners and sole owners of LaRoss. Apart from Lavino and Rossi, the Plaintiff has never

had any employees of its own.

The Defendants are Florida limited liability companies. Nikolas Spiridellis ("Spiridellis"), an individual, is the Chief Executive Officer ("CEO") of Contact and Family.

On August 3, 2007, LaRoss and Contact entered into an agreement (the "Agreement"). The purpose of the Agreement was to market and sell the "FamilyContact911 Product," an internet-based, subscription service that provided customers with emergency/disaster communication services.

Family is not a party to or signatory to the Agreement. In fact, Family was formed on August 9, 2007, six days after the Agreement was executed.

The Agreement was initially drafted by Lavino, who never consulted with or had an attorney review it prior to sending it to the Defendants, or prior to executing it. Joseph Cline ("Cline") acted as a "broker" or "referral agent" on behalf of LaRoss for purposes of executing the Agreement.

Under the Agreement, customers purchasing the "FamilyContact911 Product" would be billed by their local telephone company or local exchange carrier ("LEC") with a separate charge appearing on their monthly telephone bill for the services purchased. In order to be able to use LEC billing services, a company must first apply and be approved for LEC billing.

After such approval, LaRoss agreed to provide a marketing program to sell the product, a bill system that would allow for monthly billing and processing of LEC payments, weekly billing, and other customer support functions. (The Agreement, Compl., Exh. A., at 1.)

LaRoss promised that the initial project, Phase I, would take an estimated two to six weeks to deliver. LaRoss also agreed and promised that it would, "to the best of its abilities, deliver this project into production on time for [Contact]'s approval." (Id.) LaRoss would then

undertake an internet-based marketing campaign for the product, Phase 2, including funding the marketing money for the project.

In consideration of the foregoing services, LaRoss was to receive, among other benefits, 40% of the net revenues as that term is defined in the Agreement. Contact was to receive 60% of the net revenues after the first month.

The Agreement does not contain a merger clause. Lavino did not know what a merger clause was as that term applies to contract drafting and formation. (Lavino Dep., at 198-99.)

The parties apparently verbally modified the Agreement with regard to the payment of marketing costs from revenues.

Either party could terminate the Agreement at any time "due to breach of contract, financial distress of the other party, non[-]performance or mutual agreement." (Id. at 4.)

Despite the estimated two to six-week time frame for Phase I, LaRoss did not acquire LEC approval until early 2008, more than six months after execution of the Agreement.

The parties dispute at what point after this approval LaRoss began to provide the marketing campaign and billing system. LaRoss sub-contracted out with various internet marketing companies such as Silver Carrot and Capella to provide marketing and referral services on its behalf. According to the Defendants, the Plaintiffs sub-contracted all of the agreed upon services.

For example, LaRoss engaged ILD, a clearing house for LEC billing, to perform billing services on its behalf. In connection with establishing accurate billing records, LaRoss was required to provide ILD with a complete and accurate list of customers on a monthly basis so that ILD could, in turn, properly bill those customers through their monthly phone bills.

In October 2008, Lavino communicated with Spiridellis that LaRoss was having some

logistical difficulties with the billing process.

In November 2008, LaRoss engaged the Kyle David Group, a third-party vendor, to restore its billing functionality. (Spiridellis Decl., ¶ 27.) LaRoss also engaged a company in India to field customer calls concerning the FamilyContact911 Product.

By email dated November 17, 2008, Spiridellis advised Lavino of several concerns, including LaRoss's apparent failure to submit any billing to ILD at all. (Id. at ¶ 29.)

By emails dated December 8, 2008 and December 10, 2008, Spiridellis asked Lavino to send the Defendants accounting and banking statements for the month of November 2008.

By email dated December 11, 2008, Lavino responded: "I will be getting back to you today. I hate to keep scapegoating my platform being more screwed up than any cluster fuck I've ever been involved in – but it totally consumes my day." (Exh G.)

On December 23, 2008, LaRoss, as the party responsible for the billing functions, was notified by Verizon, through ILD, that FC911 had been the subject of excessive "cramming" complaints." "Cramming" refers to the practice of placing an "unauthorized charge on someone's telephone bill." (Defs' Rule 56.1 Statement, ¶ 62.)

As a result of the excessive "cramming" complaints, Verizon required the Defendants to submit an "Action Plan" outlining how they would rectify those issues. According to Lavino, "[a]ction plans are part of the LEC experience, but they could be dangerous" because "if you cannot get below the threshold in the allotted time they give you, you could be shut down." (Id. at ¶ 64.)

By email dated January 19, 2009, Lavino advised Spiridellis, in pertinent part, as follows:

> Although I realize your anxiety over the many situations concerning Family
> Contact 911, actually as of today we are getting back as close to normal as it was
> prior to my system crashing on Oct. 21. Without a doubt my system being down
> caused most of the problems, and just keeping the product rolling along by

>constantly doing the marketing and billing has been a touch and go task which has caused an incompetence in the product offer and the process to the customer.

(Doc No. 61, Exh. S.) Lavino assured Spiridellis that LaRoss "finally [had] gotten things under control," but acknowledged "[t]he bottom line" that "if [LaRoss]'s system did not crash, we would not be talking about a lot of these issues." (Id.).

The parties dispute whether LaRoss was fully capable of performing the billing functions as required by the Agreement. The Defendants contend that these alleged difficulties caused duplicate and/or unauthorized billing of the Product.

The Defendants also contend that LaRoss failed to perform its contractual obligations regarding marketing. The Defendants note that LaRoss failed to prepare a formal or written media plan outlining how it intended to market the Product.

LaRoss first employed Silver Carrot as its media company, then Capella, and then Clash Media. However, despite the changes, by Lavino's admission, Clash Media made, "bad mistakes" and became a "lousy" marketer "as most online marketers do." (Lavino Dep., at 89-90.) LaRoss subsequently sought recommendations for a new marketing firm from Spiridellis because Clash Media was "dropping the ball big time." (Id. at 265-269.)

By email dated February 11, 2009, Spiridellis advised Lavino, Cline, and others as follows: "We have had so many mishaps with Clash [Media] that at this point I would like to make arrangements for them to run directly through us, real-time and we will submit the billing directly." (Doc No. 61, Exh. V.)

By email dated February 16, 2009, Spiridellis advised Lavino and LaRoss, in pertinent part, as follows: "I would like to have a call this afternoon to discuss the assumption of all FC911 activities by [Contact] as soon as possible." (Doc No 60., Exh M.).

By separate emails dated February 16, 2009, Spiridellis advised Cline that LaRoss's

"payments will continue as before. I just need to get this under control. Hope you understand."
(Doc No. 63, Exh. 24.)

On February 17, 2009, a conference call was held with Spiridellis, Lavino, and Cline. Also on the call was Ted Nocella, a programmer, web developer, and information technology consultant for Contact. (Nocella Decl., at ¶ 1-2.) According to Spiridellis, during that conference call, he advised Lavino that the Defendants "were terminating the Agreement based upon [LaRoss]'s non-performance, including the repeated billing problems, which [he] was entitled to do under Section 8(b) of the Agreement – the Agreement that Lavino drafted." (Spiridellis Decl., at ¶ 61.)

Spiridellis also stated in his deposition that he told Lavino and Cline that "We're cancelling," but that the Defendants would continue to pay LaRoss due to its "costs leading up to the agreement." (Spiridellis Dep., at 170.) Spiridellis also conceded that LaRoss "would get 40 percent of the profits after operating costs" for an unspecified period of time. (Id. at 171.)

LaRoss states that, even after the Defendants took over the billing functions, they agreed to continue paying LaRoss and Cline the same 40% share of net profits. However, LaRoss points to no specific documentary or testimonial evidence corroborating such an oral modification to the Agreement.

By email dated February 26, 2009, Spiridellis advised Clash Media representative Matthew Conlin that it Family and Contact would be "handling all aspects of marketing" and directing Clash Media to "cease all marketing for FamilyContact911." (Doc No. 60, Exh. O). Lavino and Cline received this communication.

By email dated March 3, 2009, Lavino advised Cindy Pollack of ILD that "After Monday, we [LaRoss] will have nothing to do with the management of Family Contact 911 – CIC 1197."

(Id., Exh P.)

Also, in early March 2009, LaRoss transferred the assets of the FC911 Chase Bank account and the account itself, which LaRoss had maintained exclusively on behalf of FC911, to the Defendants. (Spiridellis Decl., ¶ 67.)

On March 16, 2009, after the Defendants took over the billing functions, they sent the Plaintiffs a check in the amount of $16,235.01 for the previous month's ILD settlements. The parties dispute whether this check reflected a final payment under the Agreement. Since that date, there have been no payments by the Defendants to the Plaintiffs.

As noted above, on April 21, 2011, LaRoss commenced this action. On August 31, 2012, the Defendants answered the complaint and interposed breach of contract counterclaims. The pending claims are the parties competing breach of contract claims and requests for associated attorneys' fees and costs.

## II. DISCUSSION

A. The Legal Standard on a Fed. R. Civ. P. 56 Motion for Summary Judgment

Summary judgment is granted when the "movant shows there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)(quoting Fed. R. Civ. P. 56(c)). If the movant does this successfully the burden shifts, requiring the opposing party to "offer some hard evidence showing that its version of the events is not wholly

fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998). Summary

judgment is granted only when "the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party." Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691

F.3d 134, 141 (2d Cir. 2012)(quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Once a party moves for summary judgment, the non-movant must come forward with

specific facts showing that a genuine issue exists to avoid the motion being granted. West–Fair

Elec. Contractors v. Aetna Cas. & Surety Co., 78 F.3d 61, 63 (2d Cir. 1996); see also Western

World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)(quoting Fed. R. Civ. P.

56(e)).  Typically, a genuine issue of material fact exists only if "a reasonable jury could

return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); see Vann v. New York City, 72 F.3d 1040,

1049 (2d Cir. 1995).  In addition, mere conclusory allegations, speculation or conjecture will

not avail a party resisting summary judgment. See Kulak v. City of New York, 88 F.3d 63, 71

(2d Cir. 1996).

Finally, where "the sole question presented to the Court is the interpretation of a clear

and unambiguous written agreement, the issue is one of law and may properly be decided by

the Court upon a motion for summary judgment." James River Ins. Co. v. Power Mgmt., Inc.,

No. 12-CV-02706 (ADS), 2014 WL 5460548, at *5 (E.D.N.Y. Oct. 28, 2014)(quoting Amin

Realty, LLC v. Travelers Prop. Cas. Co., No. 05–CV–195 (RLM), 2006 WL 1720401, at *3

(E.D.N.Y. June 20, 2006)(citing Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co., 775 F.

Supp. 606, 609 (S.D.N.Y. 1991), aff'd, 961 F.2d 387 (2d Cir. 1992)).

B. The Parties' Respective Claims

Under New York law, the "essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." Canzona v. Atanasio, 118 A.D.3d 837, 989 N.Y.S.2d 44, 47 (2d Dep't 2014) (internal quotation and citations omitted).

The Court further emphasizes that in order for any of the parties to recover on their respective breach of contract claims, each must prove not only a breach of the contract by the opposing party, but its own performance of each of its obligations under the contract, "[not limited to] those obligations that the defendant previously cited as a basis for termination." Nature's Plus Nordic A/S v. Natural Organics, Inc., 980 F. Supp. 2d 400, 412 (E.D.N.Y. 2013). Indeed, it is well settled under New York law that a breach of contract claim requires "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC., 861 F. Supp. 2d 344, 355 (S.D.N.Y. 2012)(emphasis added)(quoting JP Morgan Chase v. J.H. Elec. of N.Y. Inc., 69 A.D.3d 802, 803, 893 N.Y.S.2d 237 (2d Dep't 2010)).

Therefore, LaRoss will not be able to prevail on its breach of contract claim unless it also proves, by a preponderance of the evidence, that it performed its own obligations under the contract. Conversely, the Defendants will not be able to prevail on their breach of contract claim unless they also prove, by a preponderance of the evidence, that they performed their obligations under the contract.

Here, the parties do not dispute the existence of the original contract. Rather, they accuse each other of breaching the original contract, and as allegedly modified, and for

causing damages as a result.

In particular, LaRoss first argues that Contact never terminated the Agreement and therefore Contact's failure to make the required contract payments after March 2009 constituted a breach of the original Agreement and/or certain alleged modifications made in February and March of 2009. Further, LaRoss argues that, in any event, it is entitled to the contractually-agreed upon division of revenues under Section 8(c), provided LEC is billing the program and net revenues are realized.

In response, in their counterclaim, the Defendants assert that LaRoss breached the contract by, among other things, failing to adequately satisfy its billing, marketing, and customer services obligations. The Defendants further contend that they terminated the agreement in February and March 2013 and evinced a clear intent to LaRoss that they were doing so. Finally, according to the Defendants, for the Court to accept LaRoss's interpretation of the contract that it is entitled to the split of revenues under Section 8(c), notwithstanding a proper terminating of the Agreement, would render the entire contract illusory and unenforceable.

Having summarized the parties' arguments, the Court first addresses LaRoss's contention that Contact never terminated the Agreement. As noted above, under Section 8(b) of the Agreement, either party could terminate at any time "due to breach of contract, financial distress of the other party, non[-]performance or mutual agreement."

There is no requirement that such a termination be reduced to writing. Rather, under Section 8(a), the only requirement relating to written notice refers separately to automatic renewals of the Agreement.

It is true, as LaRoss contends, that Spiridellis made certain oral and written

representations to Lavino and/or Cline about continuing payments under the Agreement even after Spiridellis indicated to Lavino that Contact would be essentially assuming all the work under the Agreement.  However, in late March 2013, Contact ceased making any payments to LaRoss.  Under these circumstances, the Court finds that there are genuine issues of material fact as to whether Contact terminated the Agreement or modified the Agreement based on oral and written representations and later reneged on those representations.

To the extent the Defendants argue that this alleged modification is unenforceable due to lack of consideration, the Court disagrees.

While consideration is required for a contract to be valid, "[m]odifications to a contract [] need not be supported by additional consideration when the modification is in writing and signed by the party against whom it is sought to be enforced." Deutsche Bank Sec., Inc. v. Rhodes, 578 F. Supp. 2d 652, 660 (S.D.N.Y. 2008)(citing N.Y. Gen. Oblig. Law § 5–1103); GG Managers, Inc. v. Fidata Trust Co. New York, 215 A.D.2d 241, 242, 626 N.Y.S.2d 488, 490 (1st Dep't 1995)("A written, signed agreement to discharge or modify an existing obligation is not rendered invalid because of the absence of consideration.").

To the extent the Defendants argue that such consideration was required here because the alleged modification was not in writing, that argument is belied by the record.  As noted above, Spiridellis made some of the subject representations through email correspondence. The Defendants do not challenge the authenticity of those emails sent by Spiridellis from his email address.  For the same reason, contrary to the Defendants' contention, the alleged modification does not violate the New York Statute of Frauds governing oral modifications to contracts, New York General Obligation Law § 5-701. Newmark & Co. Real Estate Inc. v. 2615 E. 17 St. Realty LLC, 80 A.D.3d 476, 477, 914 N.Y.S.2d 162, 164 (1st Dep't

2011)("An e-mail sent by a party, under which the sending party's name is typed, can constitute a writing for purposes of the statute of frauds.").

However, the Court finds that to the extent LaRoss seeks to recover under a theory of equitable estoppel, it cannot do so because (1) that claim was not plead in the May 27, 2011 amended complaint and (2) even if it was, it is duplicative of the breach of contract claim. See Guerrero v. West 23rd Street Realty, LLC, 45 AD3d 403, 404 (1st Dep't 2007).

However, LaRoss may rely on the doctrine of equitable estoppel as a defense to the Defendants' counterclaims for breach of contract. Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280 F.R.D. 147, 163 (S.D.N.Y. 2012)(under New York law, "'[e]quitable estoppel'" can form the basis of a claim, or it can serve as a defense."). In this respect, the Court notes that Laross properly plead the affirmative defense of equitable estoppel in its answer to the Defendants' counterclaims. (Doc No. 25, ¶ 44.)

However, the Court finds that LaRoss cannot proceed on any claim for breach of the implied covenant of good faith and fair dealing, raised for the first time on summary judgment, about four years following the filing of the amended complaint. LaRoss raised a number of claims in the amended complaint, but nowhere in that document does it reference a claim of breach of the implied covenant of good fair and dealing. For this reason, any claim for breach of the implied covenant of good faith and fear dealing is dismissed.

Alternatively, even had LaRoss had plead this claim, the Court would, on this summary judgment record, dismiss the claim for the simple reason that it is duplicative of the underlying breach of contract claim. See TiVo Inc. v. Goldwasser, 560 F. App'x 15, 21 (2d Cir. 2014)("had the Goldwassers specifically alleged a breach of the covenant of good faith and fair dealing, that claim would have been duplicative of their breach of contract claim.");

Netologic, Inc. v. Goldman Sachs Grp., Inc., 110 A.D.3d 433, 433–34, 972 N.Y.S.2d 33, 34–35 (1st Dep't 2013)(dismissing as duplicative a breach of implied covenant of good faith and fair dealing claim because the breach of contract claim arose from same facts and sought identical damages).

Circling back to the parties' respective claims for breach of contract, the Court notes that if the jury finds that the Defendants terminated the agreement, then in order to prevail on its breach of contract claim, LaRoss would need to prove, by a preponderance of the evidence, that the Defendants did so improperly, namely, without cause under Section 8(b).

On this question, the Court finds that there are genuine issues of material fact as to whether, assuming Contract terminated the Agreement, it did so in a contractually-permissible way, that is, based on LaRoss's material breach and/or nonperformance under Section 8(b).

When interpreting a contract under New York law, the Court should give terms like "breach" and "non-performance" that are not defined in the contract their plain and ordinary meanings. Process Am., Inc. v. Cynergy Holdings, LLC, No. 12 CIV. 772 (BMC), 2014 WL 3844626, at *9 (E.D.N.Y. Apr. 30, 2014).

As previously discussed, the Defendants marshal certain documentary evidence and deposition testimony that demonstrate significant problems existed with LaRoss's performance under the Agreement and in the performance of the subcontractors that Laross employed for purposes of the Agreement. Indeed, the summary judgment record indicates that LaRoss conceded to the Defendants in real time the severity of these issues.

Contrary to LaRoss's position, the fact that much of the performance issues stemmed directly from its subcontractors does not, as a matter of law, relieve it of its marketing,

billing, and customer service obligations under the Agreement. Put simply, while LaRoss did not breach the contract by essentially outsourcing its obligations to third-party vendors, it cannot deny breach or non-performance because the performance issues were the fault of its contractors. In any event, in the December 11, 2008 email from Lavino to Spiridellis, Lavino acknowledged significant issues in LaRoss's platform, not a platform belonging to a third-party vendor.

Nevertheless, the Court finds that there are genuine issues of fact as to whether these admitted performance issues rose to the level of a breach or non-performance.

The Court notes that "a breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the contract." Barbagallo v. Marcum LLP, 925 F. Supp. 2d 275, 287 (E.D.N.Y. 2013). Several factors bear on whether a party has substantially performed under a contract, including "the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance." CSC Recovery Corp. v. Daido Steel Co., Ltd., No. 94 Civ. 9214 (LAP), 2000 WL 134578, *6 (S.D.N.Y. Feb. 4, 2000)(quoting Hadden v. Consolidated Edison Co. of New York, Inc., 34 N.Y.2d 88, 96, 356 N.Y.S.2d 249, 312 N.E.2d 445 (1974)).

The Court is mindful that "[t]he issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186–87 (2d Cir. 2007)(citing Anderson Clayton & Co. v. Alanthus Corp., 91 A.D.2d 985, 985, 457

N.Y.S.2d 578 (2d Dep't 1983)).

With these principles in mind, the Court finds that there are genuine issues of material fact as to whether LaRoss performed its obligations under the contract and, relatedly, whether the Defendants wrongfully terminated the contract based on the alleged breach and/or non-performance by LaRoss.

Finally, the Court addresses LaRoss's interpretation of Section 8(c) that, in essence, it would be entitled to the division in revenues in perpetuity even if Contact properly terminated the contract on account of a material breach or non-performance by LaRoss, so long as LEC was billing the program and net revenues were realized. The Court finds that such a view of the contract would render the entire Agreement illusory and unenforceable.

Under the Section entitled TERM and TERMINATION, Section 8(c) provides: "The revenues will continue to be split at the agreed upon percentage for as long as the LEC is billing the program and the net revenues are realized."

"Under New York law, courts should avoid a contractual interpretation that renders an agreement illusory and unenforceable for lack of mutual obligation." Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., No. 10 CIV. 9371 (KPF), 2015 WL 1914319, at *11 (S.D.N.Y. Apr. 28, 2015); see generally M & G Polymers USA, LLC v. Tackett, 135 S. Ct. 926, 936, 190 L. Ed. 2d 809 (2015)(discussing treatise-based explanations of the illusory promises doctrine). It is also "settled" law that New York courts "will not adopt an interpretation that renders a contract illusory when it is clear that the parties intended to be bound thereby." Blandford Land Clearing Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 698 N.Y.S.2d 237, 243 (1st Dep't 1999); accord Lebowitz v. Dow Jones & Co., Inc., 847 F. Supp. 2d 599, 604 (S.D.N.Y. 2012), aff'd, 508 F. App'x 83 (2d Cir.

2013)(summary order).

In this case, the Court finds that Section 8(c) refers to the parties' obligations and rights during the term of the Agreement, not their obligations and rights after a proper termination of the Agreement. Indeed, Section 8(c) is included in a Section entitled "TERM and TERMINATION." (emphasis added).

Contrary to LaRoss's contention, the statement in paragraph 1 of the Agreement that "fees for th[e] project are ongoing" is of little import on this issue. Properly understood and consistent with the approach in New York to avoid contract interpretations that render agreements illusory, the Court finds that the "ongoing" nature of the fees refers to payments during the term of the Agreement, as opposed to a single lump sum.

The Court reaches this conclusion without relying, on the rule of contract interpretation, *contra proferentem,* as the Defendants request, in which ambiguities in contracts are interpreted against the drafting-party, here, Lavino on behalf of LaRoss. D'Amato v. Five Star Reporting, Inc., No. 12-CV-3395 (ADS)(AKT), 2015 WL 248612, at *14 (E.D.N.Y. Jan. 17, 2015)("the principle of *contra proferentem* is a doctrine under which courts will construe an ambiguity in agreement against the drafter."). Nor does the Court rely on evidence extrinsic to the four corners of the Agreement.

As an initial matter, the Court notes that, under New York law, the *contra proferentem* doctrine is "is one of last resort, which applies after all other aids to interpretation have been exhausted." In re Best Payphones, Inc., No. 01-B-15472 (SMB), 2007 WL 1388103, at *10 n. 9 (Bankr. S.D.N.Y. May 8, 2007)(citing O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc., 37 F.3d 55, 61 (2d Cir. 1994)), aff'd, 432 B.R. 46 (S.D.N.Y. 2010), aff'd, 450 F. App'x 8 (2d Cir. 2011).

Here, in the Court's view, considered in the context of the entire agreement, Section 8(c) does not provide, as LaRoss contends, that it is entitled to the split in revenues in perpetuity even if Contact permissibly terminated the contract, provided LEC was billing the program and net revenues were realized. Indeed, the doctrine of *contra proferentem* "does not compel a court to credit any and every interpretation offered by the non-drafting party." Id. In this regard, the Court finds that, for the reasons explained above, to credit this particular interpretation regarding Section 8(c) would be to render the entire contract unenforceable.

As a final aside, the Court notes that, even had any of the parties prevailed on liability at the summary judgment stage on their breach of contract claims, on this record, the question of damages would still be submitted to a jury. See Marini v. Adamo, 812 F. Supp. 2d 243, 273 (E.D.N.Y. 2011)("The statement of plaintiffs' expert is sufficient to create a genuine issue of material fact on damages that precludes summary judgment, and, accordingly, defendants' motion for summary judgment on this claim is denied."). Here, none of the parties mention damages calculations and, therefore, the Court finds that none of them has established, in their favor, the absence of a genuine issue of material fact on the issue of damages.

As to attorneys' fees under Section 3(c) of the Agreement, the Court notes that the question of whether any of the parties are entitled to such fees will be decided by the jury. However, if the jury determines that such fees are owing under the Agreement, the amount of any fees will be fixed by the Court based on a subsequent fee application. See McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1313 (2d Cir. 1993)(holding that in a fee application based on contract, "the judge determines the amount of attorneys' fees owed . . . after the liability

for such fees is decided at a trial, whether bench or jury"); <u>Cumberland Farms, Inc. v. Lexico Enterprises, Inc.</u>, No. 10-CV-4658 (ADS)(AKT), 2012 WL 1032732, at *2 (E.D.N.Y. Mar. 26, 2012)("the subsequent determination of the amount of [contractual] attorneys' fees owed presents equitable issues of accounting which do not engage a Seventh Amendment right to a jury trial.")(quoting McGuire, 1 F.3d at 1314); <u>GMC v. Villa Marin Chevrolet, Inc.</u>, 240 F. Supp. 2d. 182, 185 (E.D.N.Y. 2002)("Regardless of whether fees are awarded pursuant to statute or pursuant to contract, the determination of what is a reasonable award is within the sound discretion of the trial court."); <u>New Shows, S.A. de C.V. v. Don King Productions, Inc.</u>, No. 95 Civ. 8851 (RPP), 1999 WL 553780, at *11 (S.D.N.Y. July 29, 1999)("Because the jury found that D KP had breached the Co—Promotion Agreement, no further finding of fact needs to be made with regard to plaintiff's entitlement for attorney's fees on the breach of contract claim.  The amount of attorney's fees to be awarded may appropriately be determined by the Court instead of the jury."); <u>Orix Credit Alliance, Inc. v. Grace Indus., Inc.</u>, 261 A.D.2d 521, 521–22, 690 N.Y.S.2d 651 (2d Dep't 1999)(the court has "the inherent authority to determine reasonable attorneys' fees"); <u>compare</u> <u>Simler v. Conner</u>, 372 U.S. 221, 223, 83 S. Ct. 609, 9 L.Ed.2d 691 (1963)(holding that the Seventh Amendment requires that suits to determine and adjudicate the amount of fees owing to a lawyer by a client under a contingent fee retainer contract be tried before a factfinder).

### III.  CONCLUSION

Based on the foregoing reasons, the Defendants' motion for summary judgment is granted in part and denied in part.  In particular, Defendants' motion is granted as to dismiss any claim of breach of the covenant of good faith and fair dealing and affirmative claim of equitable estoppel.  Further, relevant here, the Court finds LaRoss cannot rely on its theory of

Section 8(c) of the Agreement, namely, that it would be entitled to the split in revenues in perpetuity even if Contact properly terminated the contract on account of a material breach or non-performance by LaRoss, so long as LEC was billing the program and net revenues were realized. The remaining theories of breach of contract raised by LaRoss, as described in this decision, may proceed to trial. That part of the Defendants' motion for summary judgment on their counterclaim for breach of contract is denied.

Concurrently, LaRoss's cross-motion for summary judgment is denied, both as to its claim for breach of contract and as to the Defendants' counterclaim for breach of contract.

As noted above, jury selection is scheduled for June 22, 2015. Having narrowed some of the issues for trial, the Court sets this matter down for a settlement conference regarding the parties' respective claims for relief to be held on Thursday May 28, 2015 at 9:30 A.M.

**SO ORDERED**
Dated: Central Islip, New York
May 21, 2015

   *Arthur D. Spatt*
   ARTHUR D. SPATT
   United States District Judge